UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| ANDRE C.T. WELLS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:18-cv-00124-JPH-DLP |
| | ) | |
| CORIZON HEALTH INC. In the official and | ) | |
| individual capacity as Health Care Provider for the | ) | |
| Indiana Department of Correction, | ) | |
| KIM HOBSON Health Service Administrator, In | ) | |
| her official and individual capacity as Healthcare | ) | |
| physician for the Wabash Valley Correctional | ) | |
| Facility, | ) | |
| MARRY CHAVEZ Doctor, In her official and | ) | |
| individual capacity as Healthcare physician for the | ) | |
| Wabash Valley Correctional Facility, | ) | |
| BOBBY RIGGS Nurse, In her official and | ) | |
| individual capacity as Healthcare physician for the | ) | |
| Wabash Valley Correctional Facility, | ) | |
| | ) | |
| Defendants. | ) | |

**Order Denying Plaintiff's Motion for Partial Summary Judgment,
Granting Defendants' Cross-Motion for Summary Judgment,
and Directing Entry of Final Judgment**

Now pending before the Court are the motion for summary judgment of plaintiff Andre

C.T. Wells and the cross-motion for summary judgment of defendants Corizon Health Inc., Kim

Hobson, Mary Chavez, and Barbara (Bobbi) Riggs. For the reasons explained in this Order, Mr.

Wells's motion is denied and the defendants' motion is granted.

**I. Introduction**

Mr. Wells in an inmate in the Indiana Department of Correction (IDOC) incarcerated at the

Pendleton Correctional Facility. On July 7, 2016, while he was incarcerated at the Wabash Valley

Correctional Facility (WVCF), Mr. Wells exacerbated a pre-existing back condition when a chair

he was sitting on collapsed. He is not satisfied with the medical care he was provided by the defendants and brings this 42 U.S.C. § 1983 action for damages. At all times relevant to Mr. Wells's allegations, Defendant Corizon was the contract medical provider at WVCF and the employer of defendants Dr. Mary Chavez, Nurse Barbara Riggs, and Health Care Administrator Kim Hobson. Mr. Wells alleges Corizon maintained policies or practices that violated his Eighth Amendment rights, and that the individual defendants were deliberately indifferent to his serious medical needs. This action is proceeding on Mr. Wells's original complaint filed March 15, 2018.  All parties have moved for summary judgment.

## II. Summary Judgment Legal Standards

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the

district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017). The non-moving party bears the burden of specifically identifying the relevant evidence of record. *D.Z. v. Buell*, 796 F.3d 749, 756 (7th Cir. 2015). This is in part because summary judgment is the "put up or shut up" moment in a lawsuit. *Grant*, 870 F.3d at 568.

When reviewing cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the respective motion was made. *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018) (citing *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017)). The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Local Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003).

### III. Disputed and Undisputed Material Facts

Consistent with the legal standards set out above, the following facts are undisputed except as otherwise noted. *Whitaker v. Milwaukee Cnty.*, 772 F.3d 802, 808 (7th Cir. 2014). That is, the undisputed statements of fact are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and any disputed evidence are presented in the light most favorable to the non-moving party. *Whitaker v. Wisc. Dep't of Health Serv's,* 849 F.3d 681, 683 (7th Cir. 2017). Material disagreements are identified and discussed.

#### A. Mr. Wells's Medical Records.

On July 7, 2016, Mr. Wells was sitting in a chair at WVCF when it collapsed, dropping him to the floor, hurting his back. Dkt. 2 (original complaint) at ¶ 11. WVCF staff asked Mr. Wells if he believed he needed to go to medical. Dkt. 103 (plaintiff's response) at p. 2. Staff also asked

him if he wanted to make an incident report, and then asked whether he needed medical treatment. *Id.* Mr. Wells did not go to medical or seek medical treatment that day.

Mr. Wells contends that the next day, July 8, 2016, he submitted a request for health care (RFHC) describing how he injured his back and asking to be seen. He also contends that he was seen by Nurse Riggs on July 11, 2016. Dkt. 2 at ¶ 11. The medical record does not contain a RFHC for July 9, nor does it contain a record of a medical visit on July 11.

The medical record does contain, however, Mr. Wells's HCRF, number 253059, dated July 16, 2016, reporting pain in his back from the chair collapse and that his hand loses feeling on occasion. Dkt. 101 at p. 149. The staff response section reads "Seen already," appears to bear Mr. Wells's signature, and is dated July 19, 2016. *Id.* Nurse Riggs contends that she verified that Mr. Wells had been seen for this RFHC and now declined further evaluation. *Id.*; dkt. 100-4 at ¶ 5.

On August 10, 2016, Mr. Wells submitted another RFHC and stated that he was still experiencing pain in his lower right back and requested to see the doctor. Dkt. 101 at p. 147. Nurse Riggs received Mr. Wells's RFHC on August 11, 2016, and triaged Mr. Wells on August 12, 2016. *Id.* Nurse Riggs documented that Mr. Wells said his pain was at level 7-8 on a 1-10 scale and that he was in too much pain to complete the exercises for his back pain that were suggested at the previous medical visit. *Id.* at pp. 85-86; dkt. 100-4 at ¶ 6. On examination, Mr. Wells reported tenderness, pain with movement, and spasms. *Id.* Mr. Wells exhibited a limited range of motion but no swelling was apparent. *Id.* Mr. Wells reported that he had been taking ibuprofen which helped with his pain somewhat. *Id.* Nurse Riggs referred Mr. Wells to see the doctor for further evaluation. *Id.*

On September 6, 2016, Nurse Ashley Swartzentruber (not a defendant to this action) examined Mr. Wells during his annual Nurse Well Encounter. Dkt. 101 at pp. 80-84. Nurse Swartzentruber did not note any complaints about back pain, nor limitations associated therewith. *Id*. Nurse Swartzentruber classified Mr. Wells as "free of illness or injury; free of physical impairment" on a medical status classification report but she had not asked him whether he continued to have back pain. *Id*.; dkt. 103 at p. 3, ¶ 3.

Mr. Wells submitted another RFHC on September 12, 2016, complaining of back pain. Dkt. 101 at p. 146. Mr. Wells was evaluated by a nurse who recommended to Mr. Wells that he continue his back exercises and could purchase "muscle rub" from the commissary. *Id*. at pp. 75-77. The nurse also referred Mr. Wells for a physician visit. *Id*. On October 24, 2016, Mr. Wells submitted another RFHC complaining of back pain, and the nursing staff responded on October 27, 2016, stating that Mr. Wells was already scheduled to see a doctor the next day. *Id*. at p. 145.

On October 28, 2016, Dr. Mary Ann Chavez examined Mr. Wells for his back pain. Dkt. 101 at pp. 74-75; dkt. 100-1 at ¶ 8). Mr. Wells reported that he had been doing back exercises, walking the track, and taking 200 mg of ibuprofen which provided some relief. *Id*. Mr. Wells added that he was unable to jump, run, sit for long periods of time, or lift weights. *Id*.; dkt. 103 at p. 2, ¶ 4. Dr. Chavez found that Mr. Wells had a normal gait, and he could bend forward until his fingertips almost touched his toes. Dkt. 100-1 at ¶ 4. This was a normal range of motion. *Id*. Dr. Chavez diagnosed Mr. Wells with lumbago (back pain) and prescribed Nortriptyline for pain relief. *Id*. It was Dr. Chavez's opinion that Mr. Wells's symptoms did not indicate the need for an x-ray or other imaging, and that his condition was not urgent or an emergency. *Id*.

On November 27, 2016, Mr. Wells submitted another RFHC reporting lower back pain, describing it as feeling like he was "carrying a lot of weight." Dkt. 101 at p. 144. Nurse Robinson examined him the next day. *Id.* at pp. 70-72. Mr. Wells rated his pain at level 3 on a 1-10 scale. *Id.* Mr. Wells reported no tenderness but said that he had pain with movement. *Id.* Range of motion and gait were normal, there was no swelling or bruising, and Mr. Wells was able to walk without difficulties. *Id.* Nurse Robinson obtained a verbal order from a doctor to give Mr. Wells a back brace. She then counseled Mr. Wells to continue his back exercises, stretching, and apply ice and heat as needed. *Id.* As to his pain level, Mr. Wells asserts that he experienced level 3 pain on that day during the nurse visit, but that his pain ranged from level 3 to level 8 day to day. Dkt. 103 at p. 3, ¶ 5.

On December 10, 2016, Mr. Wells submitted a RFHC complaining of side effects from his pain medication. Dkt. 101 at p. 143. Nurse Riggs examined Mr. Wells on December 12, 2016, and provided education on the side effects of his medication and the importance of following the doctor's orders. *Id.* at p. 69; Dkt. 100-4 at ¶ 8). Mr. Wells's back brace was also delivered on December 12, 2016. Dkt. 101 at p. 68. Mr. Wells points out that was five months after his injury. Dkt. 103 at p. 3, ¶ 6.

On December 18, 2016, Mr. Wells made another RFHC reporting that his medication was not helping. Dkt. 101 at p. 141. Nurse Riggs triaged Mr. Wells two days later. *Id.* Mr. Wells reported that the medication did not alleviate his pain, adding that he was having night sweats. Dkt. 101 at pp. 65-67; dkt. 100-4 at ¶ 9. The examination indicated tenderness and pain with movement, no spasms or weakness, normal range of motion and gait, and no indication of swelling or numbness. *Id.* Nurse Riggs referred Mr. Wells to see the doctor. *Id.*

On December 22, 2016, Dr. Chavez saw Mr. Wells about his back pain. Dkt. 101 at pp. 63-64; Dkt. 100-1 at ¶ 10. Mr. Wells said that his prescribed Nortriptyline was ineffective and was causing side effects, but that ibuprofen gave him partial relief. *Id*. Dr. Chavez recommended that Mr. Wells alternate ibuprofen and acetaminophen for pain relief and instructed him to apply heat twice daily. *Id.*

After he saw Dr. Chavez, Mr. Wells sent a RFHC to Kimberly Hobson, the Health Service Administrator, expressing disagreement with Dr. Chavez's treatment plan. Dkt. 101 at p. 140; dkt. 100-2 at ¶ 10. HSA Hobson instructed Mr. Wells to submit another RFHC if he was still having issues. *Id*. HSA Hobson did not have the authority to determine what Mr. Wells's treatment should be, so she deferred to the treatment recommended by the doctor. Dkt. 100-2 at ¶ 10.

Five days later, on December 27, 2016, Mr. Wells submitted a RFHC requesting to see an outside specialist. Dkt. 101 at p. 139. A nurse responded and told Mr. Wells that he was scheduled to see his doctor. *Id*. Mr. Wells renewed his request to see a specialist by submitting another RFHC on January 16, 2017. Dkt. 101 at p. 138. Like before, a nurse responded by telling Mr. Wells that he was scheduled to be seen by the doctor. *Id*.

The next RFHC came on February 7, 2017; Mr. Wells stated that he was being denied medical treatment. *Id.* at p. 113. As was the case with the two prior RFHS, a nurse responded by telling Mr. Wells that he was scheduled to meet with the doctor. *Id*.

On the same day, Dr. Chavez examined Mr. Wells for his back pain. Dkt. 101 at pp. 61-62; dkt. 100-1 at ¶ 11. Mr. Wells said that he took three tablets of ibuprofen twice daily, and also three tabs of Tylenol twice daily. *Id*. Mr. Wells requested additional pain medication, so Dr. Chavez prescribed Venlafaxine ER 37.51, but also told him to continue to take the ibuprofen and Tylenol. *Id*.

On March 13, 2017, Mr. Wells again complained of continued back pain. Dkt. 101 at p. 136. Nurse Riggs examined Mr. Wells on March 15, 2017. *Id.*; dkt. 100-4 at ¶ 11. Mr. Wells reported tenderness but no pain with movement. *Id.* His range of motion was normal, and he had no spasms, weakness, numbness, or swelling. *Id.* Nurse Riggs again instructed Mr. Wells on a self-exercise program. *Id.* Mr. Wells seemed to agree and understand. *Id.*

But six days later, on March 19, 2017, Mr. Wells requested to see an orthopedic surgeon. Dkt. 101 at p. 135. Nurse Riggs triaged Mr. Wells on March 21, 2017, and referred Mr. Wells to a prison doctor. *Id.*; dkt. 100-4 at ¶ 12.

On March 30, 2017, Dr. Chavez saw Mr. Wells for his continuing complaints of low back pain. Dkt. 101 at pp. 48-50; dkt. 100-1 at ¶ 12. Mr. Wells reported that his back felt like he was being "stabbed with a hot knife" and that his "bones are rubbing together." *Id.* Mr. Wells was able to forward bend and reach his ankles, side bend, and touch his knees. *Id.* On physical exam, Dr. Chavez noted a ropey texture to the right of the spinous process in the lumbar area. *Id.* Due to this new finding, Dr. Chavez ordered x-rays of Mr. Wells's lumbar spine. *Id.*

On March 31, 2017, a radiologist reported that x-rays of Mr. Wells's lumbar spine showed no acute osseous abnormality or significant degenerative change. Dkt. 101 at p. 152; dkt. 100-1 at ¶ 13. Dr. Chavez provided no further care for Mr. Wells after March 31, 2017. Dkt. 100-1 at ¶ 14.

On April 22, 2017 and then again on May 9, 2017, Nurse Riggs reviewed RFHCs from Mr. Wells complaining of back pain, and each time she scheduled Mr. Wells to see the doctor. Dkt. 100-4 at ¶¶ 13-14). On June 2, 2017, subsequent x-rays ordered by Dr. Samuel Byrd demonstrated "L5 Bilateral spondylolysis without spondylolisthesis." Dkt. 101 at p. 153. Dr. Byrd noted these findings were not present on Mr. Wells's previous x-rays. *Id.*

Dr. Byrd explains that treatment for spondylolysis is conservative and surgery is extremely rare and only indicated when a patient exhibits signs of neurological injury. Dkt. 58-4 at ¶¶ 9-10. Mr. Wells had not exhibited such symptoms. *Id.*

On October 2, 2017, Nurse Riggs again examined Mr. Wells for his back pain and noted that he was able to walk to chow and play pool during recreation, to her an indication that Mr. Wells's back pain did not interfere with his activities of daily living. Dkt. 100-4 at ¶ 16. But Mr. Wells adds that playing pool is not a very demanding activity, and that at this point he still could not weight train, run, or sit upright for long periods of time. Dkt. 103 at p. 3, ¶ 8.

The defendants set out certain facts applicable to specific defendants, a format the Court finds helpful considering Mr. Wells's long medical history and the claims he makes. The remaining facts follow that format.

**B. Dr. Chavez**

Dr. Chavez is a licensed osteopathic physician practicing in Indiana during all times relevant to this lawsuit. Dkt. 100-1 at ¶ 2. Dr. Chavez was the medical director at the WVCF during this time. *Id.* Dr. Chavez did not schedule patients or review and respond to RFHC. *Id.* at ¶ 17. Dr. Chavez's employment at WVCF ended on or about May 9, 2017. *Id.* at ¶ 3.

It is Dr. Chavez's professional medical opinion that Mr. Wells's symptoms did not warrant referral to a specialist. *Id.* at ¶ 16. She believed that Mr. Wells's range of motion was normal, he exhibited a normal gait, and he reported his pain was managed with over-the-counter pain medication. *Id.* at ¶ 16.

**C. Nurse Riggs**

Nurse Riggs has been a licensed registered nurse practicing in Indiana since 2009. Dkt. 100-4 at ¶ 2. In her job at WVCF, she could refer inmates to see the doctor, but she did not

schedule inmate appointments with the doctor. *Id*. at ¶ 7. Nurse Riggs cannot prescribe medication, diagnose medical conditions, or formulate treatment plans. *Id*. at ¶ 19. She also reviews inmates' RFHC and triages them. *Id*. at ¶ 20. Nurse Riggs testified that Mr. Wells's condition was always stable when she saw him, and that she believed it was never indicated for him to see the doctor sooner than his next scheduled appointment. *Id*. at ¶¶ 20-21. Mr. Wells always had pain medication for his pain. *Id*.

### D.  Kimberly Hobson

Nurse Hobson is also a licensed registered nurse practicing in Indiana. Dkt. 100-2 at ¶ 2. During all times material to this lawsuit, she was employed as the Health Services Administrator (HSA) at WVCF. *Id.* In her role as the HSA, Nurse Hobson was the administrative manager of the WVCF medical operations. *Id*. ¶ 5. She could not order a doctor to provide specific medical treatment or otherwise dictate the medical care of the inmate. *Id*. at ¶ 7. Even though she is a nurse, she did not make treatment plans or override the medical judgment of the doctors. *Id*. Nurse Hobson is not aware of any failure of defendant Corizon to properly train its employees to respond to medical emergencies or serious medical needs. *Id*.

In her role as HSA, Nurse Hobson also reviewed and responded to informal and formal grievances submitted by inmates concerning their healthcare. *Id.* at ¶¶ 6-7. Performing that role, Nurse Hobson reviewed Mr. Wells's November 14, 2016, grievance. *Id*. at ¶ 8. She reviewed Mr. Wells's medical records and determined Mr. Wells saw a nurse in August 2016, and saw Dr. Chavez in October. *Id.* Mr. Wells was given a course of treatment which including pain medications. *Id*.

Nurse Hobson states that she never provided or denied medical treatment to Mr. Wells. *Id.* at ¶ 11. Nurse Hobson's involvement in Mr. Wells's medical care was responding to his November 2016 grievance and responding to his December 22, 2016, RFHC.

## IV. Discussion

Mr. Wells's claims are (1) the defendants were deliberately indifferent to his serious medical needs by delaying and denying proper treatment for his back injury; (2) that the deliberate indifference has caused him emotional distress; (3) that Corizon has a policy, practice, custom, or habit of failing to train its medical employees how to provide emergency assessments and render emergency care; and (4) that Corizon has breached its contract with the State of Indiana to provide competent medical care to Indiana inmates. Dkt. 2.

For purposes of summary judgment, the defendants concede that Mr. Wells's condition presents a serious medical need. Dkt. 99.

### A. Deliberate Indifference Claims

Mr. Wells's claims against Dr. Chavez, Nurse Riggs, and Nurse Hobson for deliberate indifference to his serious medical needs are evaluated, because he is a convicted offender, under the Eighth Amendment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Prison officials have a duty to provide humane conditions of confinement, which includes *adequate* medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To prevail on a deliberate indifference to serious medical needs claim, Mr. Wells must show that (1) he suffered from an objectively serious medical condition, and (2) the defendant knew about the condition and the substantial risk of harm it posed but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v.*

*County of Madison*, 746 F.3d 766, 775 (7th Cir. 2014); *see also Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (*en banc*) ("To determine if the Eighth Amendment has been violated in the prison medical context, [courts] perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition.").  The Seventh Circuit recently explained what is required to establish deliberate indifference:

> To prove deliberate indifference, mere negligence is not enough.  A plaintiff must provide evidence that an official actually knew of and disregarded a substantial risk of harm. The linchpin is a lack of professional judgment. A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances. A prison medical professional faces liability only if his course of treatment is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

*Campbell v. Kallas*, 936 F.3d 536, 544-45 (7th Cir. 2019) (internal citations and quotations omitted). Put another way, deliberate indifference means a culpable state of mind equivalent to criminal recklessness. *Rivera v. Gupta*, 836 F.3d 839, 842 (7th Cir. 2016).

### 1. Mr. Wells's Motion for Partial Summary Judgment

Mr. Wells seeks summary judgment against "the defendants" for delaying treatment of his back injury, a delay he contends is deliberate indifference to his serious medical needs. Dkt. 93. He asks for judgment on liability, leaving the amount of damages for later determination. *Id.* As noted, the defendants have responded and filed their own motion for summary judgment. Dkt. 99.

What's identified by the plaintiff as undisputed material facts is not supported by citation to designated evidence.  *See, e.g.,* Dkt. 94 at p. 1 (five facts identified by plaintiff).  Mr. Wells's declaration similarly does not support his motion for summary judgment because it only identifies him as the plaintiff, states that he is presently at the Pendleton Correctional Facility and makes the

conclusory allegation that the defendants were deliberately indifferent. Dkt. 95. Conclusory statements and arguments unsupported by admissible evidence are not sufficient to support a motion for summary judgment.  *See* Fed. R. Civ. P. 56(e); S.D. Ind. L.R. 56-1(e).

The Court finds no basis upon which to grant Mr. Wells summary judgment against the defendants for reasons most appropriately discussed in the section below addressing the defendants' cross-motion.

Mr. Wells's motion for partial summary judgment, dkt. 93, is **denied**.

### 2. Individual Defendants' Motion for Summary Judgment

Consistent with S.D. Ind. L.R. 56-1(c), the material facts asserted by the defendants are supported by designated evidence, that is, "citation to a discovery response, a deposition, an affidavit, or other admissible evidence."   Dr. Chavez, Nurse Riggs, and Nurse Hobson have each submitted admissible evidence documenting in detail Mr. Wells's medical treatment and their respective roles. This material includes their sworn affidavits, the affidavit of Dr. Samuel Byrd, and Mr. Wells's medical records. *See* dkt. 48-4; dkts. 100-1, 100-2, 100-3, 100-4, & dkt. 101. Set out for the most part in Section III, above, they describe a long series of medical examinations with various providers, two of them defendants here, offering several and progressive remedies; exercise, different pain medications in different combinations, ice and heat, a back brace, and finally x-rays. The record demonstrates that Mr. Wells suffers from a back condition that will take some time to heal, but only if the body is given an opportunity to heal, or it might be a lifelong condition. Dr. Samuel Byrd testifies in greater detail:

> Treatment for spondylolysis is conservative. Spinal surgery is extremely rare and generally only indicated when the patient exhibits signs of a neurological issue. The main cause of pain with spondylolysis is inflammation, so managing inflammation is the key to pain relief. Inflammation can be reduced with non-steroidal anti-inflammatory drugs ("NSAIDs"), such as Ibuprofen, ice, rest, and use of a supportive brace. Exercises, such as stretching and abdominal core strengthening,

are also very important. The condition should heal on its own, as long as the patient gives the body time to heal. Although, patients with spondylolysis are prone to recurrence and it can be a lifelong issue.

Dkt. 48-1 at ¶ 9.

The lengthy statement of facts set forth above was largely undisputed by Mr. Wells. Even taking as true all of Mr. Wells's assertions and interpretations (except for allegations of conspiracy and sadistic intent), the medical record does not demonstrate deliberate indifference. The Court examines each of the three individual defendants' roles separately.

### (a) Dr. Chavez

Dr. Chavez treated Mr. Wells four times. She first saw him on October 28, 2016, when he reported that he was doing back exercises, walking the track, and taking 200 mg of ibuprofen which provided some relief. But he told her his limitations – he could not jump or run, he could not sit for long periods of time, nor could he lift weights. *Id*.; dkt. 103 at p. 2, ¶ 4. Mr. Wells's gait was normal and he could almost touch his toes. This was a normal range of motion. *Id*. Dr. Chavez diagnosed Mr. Wells with lumbago (back pain) and prescribed Nortriptyline for pain relief, the first time he had prescription pain medication for his back. Dr. Chavez's professional medical opinion was that Mr. Wells's symptoms did not then indicate an x-ray or other imaging should be done. She noted that his condition was not urgent nor an emergency. Dkt. 100-1.

When Dr. Chavez next saw Mr. Wells, on December 22, 2016, he said that the Nortriptyline was ineffective and caused side effects, but that he still had partial pain relief from the ibuprofen. *Id*. Dr. Chavez recommended that he alternate ibuprofen and acetaminophen for pain relief and instructed him to apply heat twice daily. *Id.* Mr. Wells was apparently unhappy about the treatment plan and complained to Nurse Hobson that he wanted to be seen by an outside specialist.

On February 7, 2017, Dr. Chavez saw Mr. Wells for the third time. Mr. Wells told her that he was taking three tablets of ibuprofen and three tablets of Tylenol twice daily and requested additional pain medication. Dr. Chavez prescribed Venlafaxine ER 37.51, but also told him to continue to take the ibuprofen and Tylenol. *Id.*

The last time Dr. Chavez saw Mr. Wells was on March 30, 2017.  Mr. Wells was able to forward bend and reach his ankles, side bend, and touch his knees. But Dr. Chavez noted the "ropey texture" on the right side of Mr. Wells's lower spine and ordered x-rays. The next day a radiologist reported no abnormal findings in the x-rays.

Mr. Wells argues that Dr. Chavez was deliberately indifferent to his serious medical needs when she did not prescribe him medication until three months after he had been injured by the chair collapse. Dkt. 103 at p. 6, ¶ 5. He terms this a significant delay in medical treatment that demonstrates deliberate indifference. *Id.*

The evidence shows that Dr. Chavez prescribed medication during her first meeting with Mr. Wells. The second time she met with him, he reported side effects from the medication and reported that he obtained some relief with over-the-counter medications. Dr. Chavez suggested he take both ibuprofen and Tylenol for pain. The third time Mr. Wells saw Dr. Chavez she prescribed a different medication in response to Mr. Wells's pain complaints. The final time they met, Dr. Chavez found the "ropey texture" and ordered x-rays, but the x-rays failed to reveal any abnormality.

This record shows that Dr. Chavez never neglected or deliberately ignored Mr. Wells's back pain. She was aware of his pain and addressed it. She ordered x-rays at the first indication they were necessary. Mr. Wells argues that the prescribed medications were antidepressants, not

pain medicines. Dr. Byrd testifies that antidepressants are used to treat long term chronic pain, and Mr. Wells provides no evidence otherwise. Dkt. 48-1.

A prison medical professional faces liability only if her course of treatment is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the medical professional did not base the decision on such judgment. *Campbell*, 936 F.3d at 544-45. Mr. Wells provides no evidence of a substantial departure, and the Court sees none.

Dr. Chavez's request for summary judgment is **granted**.

### (b) Nurse Hobson

Nurse Hobson is the HSA who responded to one of Mr. Wells's grievances and one of his RFHCs. Neither time did she provide medical care, fail to schedule appointments, or refuse to allow him to be treated. She could not schedule appointments with outside specialists. When Mr. Wells told her that he wanted to see a specialist, she informed him what he needed to do – submit a RFHC to see a physician.

Mr. Wells's complaint is vague about what Nurse Hobson did, or failed to do, that constitutes deliberate indifference. In his complaint he repeatedly refers to "the defendants" without attributing specific conduct to a specific individual. Dkt. 2. In his response to the cross-motion for summary judgment he argues that Nurse Hobson was in charge of resolving and/or investigating his grievance about his pain and suffering. Dkt. 103 at p. 6, ¶ 4. But he does not connect the dots, so to speak, to suggest how a failure to investigate a grievance caused him any harm. *Id.* The record shows that Nurse Hobson provided a prompt response to Mr. Wells both times she dealt with him.

The action Mr. Wells is likely referring to is described in Nurse Hobson's affidavit. Dkt. 100-2 at ¶ 8. She describes her response to a grievance made by Mr. Wells to custody officials

about the collapsed chair. IDOC Lieutenant Nicholson investigated the incident and asked Nurse Hobson for information. She responded that there were no records indicating that Mr. Wells had sought or been seen by medical providers in July 2016. Dkt. 100-2 at ¶ 8. Giving Mr. Wells all reasonable inferences, Nurse Hobson's response was incorrect. Mr. Wells sought treatment and was likely seen by Nurse Riggs in July. But as noted above, Mr. Wells has not suggested or provided evidence that Nurse Hobson's incorrect response violated his federal constitutional rights. There is no constitutional right to a grievance system, *see Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011), and the denial of a grievance, by itself, is not a federal claim. *See Owens v. Evans*, 878 F.3d 559, 563 (7th Cir. 2017) ("Prison officials who simply processed or reviewed inmate grievances lack personal involvement in the conduct forming the basis of the grievance."). There is no suggestion or evidence that Nurse Hobson's incorrect response caused a delay in treatment.

Nurse Hobson's request for summary judgment is **granted**.

### (c) Nurse Riggs

Mr. Wells's claim against Nurse Riggs is that she prescribed him a home exercise program (HEP), which caused him more pain, and "insisted" that he keep doing HEP despite the pain. Dkt. 103 at p. 5, ¶ 2. The HEP papers Nurse Riggs gave to Mr. Wells are twelve pages of illustrated exercises, some as simple as bending or twisting at the waist, and some such as leg lifts. Dkt. 2-1 at pp. 7-19. Mr. Wells argues that Nurse Riggs prescribed the HEP without a diagnosis, that the HEP caused him more pain, and thus Nurse Riggs was deliberately indifferent. Dkt. 103 at p. 5, ¶ 2.

Nurses Riggs's job included triaging inmates' RFHCs. In doing so, she used her years of experience to assess the inmate's condition, making a nursing diagnosis based on the inmate's subjective complaints and the inmate's objective physical condition based on vital signs and her

observations. Dkt. 100-4 at ¶ 20. When the inmate's condition is urgent, she refers him to the doctor. If the condition is routine, she educates the inmate and urges him to submit another HCRF if the condition worsens. *Id.*

Mr. Wells argues that it was deliberate indifference for Nurse Riggs to tell him to exercise before a diagnosis was made, but he offers no evidence to suggest that doing so would be such a "substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *See Campbell*, 936 F.3d at 544-45. To the contrary, Nurse Riggs's assessment of Mr. Wells's back pain and recommendation for a HEP was a reasoned professional medical treatment decision. "A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Id.* Because Mr. Wells presents no evidence that Nurse Riggs's treatment decision was such a substantial departure from accepted professional judgment, his claim concerning the HEP recommendation fails.

The medical record, dkt. 101, and Nurse Riggs's affidavit are evidence that each time she examined Mr. Riggs she either gave him instruction and information that he accepted, or she referred him right away to the doctor. There is no delay of treatment shown. But even if there were delays, such as the time in between the submission of the RFHC and the provider visit, Mr. Wells has not pointed to evidence that his condition became worse because of the delay. *See Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007) (holding that a plaintiff must "offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm").

Nurse Riggs's request for summary judgment is **granted**.

## B.  Infliction of Emotional Distress Claim

Mr. Wells's complaint also asserts a claim for infliction of emotional distress due to the defendants' deliberate indifference. Dkt. 2. He has provided no evidence of emotional distress, nor has he identified a specific defendant responsible for inflicting emotional distress. *Id.* Mr. Wells has not addressed emotional distress in his response. There was no deliberate indifference to Mr. Wells's serious medical needs that could be the proximate cause of emotional distress.

### C.  Claims Against Corizon

Mr. Wells's claims against Corizon are (1) that it maintains a policy, practice, or habit of failing to train its medical staff to conduct emergency assessments and emergency treatments, and (2) it has breached its contract with Indiana to provide adequate medical services in Indiana prisons. Dkt. 2.

### 1.  Policy or Practice Claim

In *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Court recognized a § 1983 claim against a municipality for employing, or failing to employ, a practice, policy, or habit causing a constitutional violation. *Monell* has been extended to private corporations contracting with a state to provide essential government functions, in other words "acting under color of state law." *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378-79 (7th Cir. 2017) (*en banc*). "The critical question under *Monell* . . . is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Id.* at 379. A successful *Monell* claim must first identify the specific policy causing the constitutional harm. Mr. Wells alleged in his complaint that Corizon has a policy of not training its employees to provide or assess urgent (emergency) medical care. Dkt. 2. at ¶ 8.

In response to the defendants' motion for summary judgment, Mr. Wells is obligated to present admissible evidence that such a policy actually exists. *Grant*, 870 F.3d at 568. He has not

done so. The summary judgment record contains no evidence of any Corizon policies or evidence of a need to implement a policy for emergency medical services. Mr. Wells has failed to demonstrate a genuine issue of material fact on this claim.

Corizon's request for summary judgment on this claim is **granted**.

### 2. Breach of Contract Claim

Mr. Wells's last claim is that Corizon breached its contract with Indiana to provide adequate medical services in state prisons. Dkt. 2. Indiana law governs this claim.

It is well-settled law that "[t]he parties to a contract are the ones to complain of a breach, and if they are satisfied with the disposition which has been made of it and of all claims under it, a third-party has no right to insist that it has been broken." *Harold McComb & Son, Inc. v. JPMorgan Chase Bank*, 892 N.E.2d 1255, 1258 (Ind. Ct. App. 2008) (internal quotation omitted). There is no evidence in the summary judgment record that the State of Indiana is not satisfied with Corizon's contract performance.

Mr. Wells contends that he is an intended third-party beneficiary under the Corizon contract. The Indiana Supreme Court has explained the circumstances under which a third party to a contract may sue to enforce the contract:

> To be enforceable, it must clearly appear that it was the purpose or a purpose of the contract to impose an obligation on one of the contracting parties in favor of the third party. It is not enough that performance of the contract would be of benefit to the third party. It must appear that it was the intention of one of the parties to require performance of some part of it in favor of such third party and for his benefit, and that the other party to the agreement intended to assume the obligation thus imposed. The intent of the contracting parties to bestow rights upon a third party must affirmatively appear from the language of the instrument when properly interpreted and construed.

*Cain v. Griffin*, 849 N.E.2d 507, 514 (Ind. 2006) (internal quotation omitted). A third-party beneficiary must show the following:

(1) A clear intent by the actual parties to the contract to benefit the third party;

(2) A duty imposed on one of the contracting parties in favor of the third party; and

(3) Performance of the contract terms is necessary to render the third party a direct benefit intended by the parties to the contract.

*Eckman v. Green*, 869 N.E.2d 493, 496 (Ind. Ct. App. 2007). "The intent to benefit the third-party is the controlling factor and may be shown by specifically naming the third-party or by other evidence." *Id*.

Mr. Wells has not attempted to make the requisite showing that he is an intended third-party beneficiary of the contract between Corizon and the State of Indiana. Without such a showing, his breach of contract claim fails. Corizon is entitled to summary judgment on Mr. Wells's Indiana state law claim of breach of contract.

### V. Conclusion

For the reasons discussed in this Order, plaintiff Andre C.T. Wells's motion for partial summary judgment, dkt. [93], is **denied**. The cross-motion for summary judgment of defendants Corizon Health, Dr. Mary Chavez, Nurse Barbara Riggs, and Health Services Administrator Kim Hobson, dkt. [99], is **granted** on all claims. This action is **dismissed** with prejudice. Final judgment consistent with this Order shall now enter.

**SO ORDERED**.

Date: 5/18/2020

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Andre C.T. Wells
196966
Pendleton Correctional Facility
Inmate Mail/Parcels
4490 West Reformatory Road
Pendleton, IN 46064

Douglass R. Bitner
Katz Korin Cunningham, P.C.
dbitner@kkclegal.com

Jeb Adam Crandall
Bleeke Dillon Crandall Attorneys
jeb@bleekedilloncrandall.com

Rachel D. Johnson
Katz Korin Cunningham, P.C.
rjohnson@kkclegal.com

Nathan Aaron Pagryzinski
Bleeke Dillon Crandall, P.C.
nathan@bleekedilloncrandall.com